# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | No. CR 06-397 TUC FRZ (JM) |
| ) | |
| v. ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| Duke James Preston and ) | |
| Michelle Marlina Lopez, ) | |
| ) | |
| Defendants. ) | |

This matter was referred to Magistrate Judge Marshall for all pretrial matters. A Motion to Suppress: Illegal Stop [Docket No. 27] and Amended Motion to Suppress: Illegal Stop [Docket No. 30] filed by Defendant Michelle Marlina Lopez, in which co-defendant Duke James Preston joined [Docket No. 31], were heard by Magistrate Judge Marshall on September 19 and November 1, 2006. Defendant Lopez was present at the hearings, was represented by counsel, and testified on her own behalf. Defendant Preston did not testify at the original hearing and passed away before the continued hearing. [Docket No. 57]. In addition to Defendant Lopez, two witnesses were presented: Tohono O'Odham Police Department Officer Sean Dailey and Investigator Gilbert Duron. The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Lopez's Motions be granted.

## I. **TESTIMONY AND EVIDENCE**

### A. **Officer Sean Dailey**

On January 26, 2006, at approximately 7:35 p.m., Officer Dailey was patrolling State Route 86 on the Tohono O'Odham reservation. (TR1:14-15).[1] He was alone and had parked his patrol vehicle approximately 25 feet off the side of the road and was "hiding in the bushes" in the dark with his headlights off. (TR1:15, 48 & 55; Exhibit 1 (photograph of area)). Officer Dailey's recollection is that he was located at approximately Milepost 137. (*Id.*). At this point of Route 86, a "no passing" sign is posted and there is a solid yellow line indicating that the area is a no passing zone for east-bound traffic. (TR1:18-20). The speed limit is 65 miles per hour. (TR1:81-82).

Officer Dailey noticed a blue Isuzu Trooper sport utility vehicle driving eastbound and attempting to pass another vehicle. (TR1:18 & 49). Officer Dailey believed that the vehicle was traveling at a high rate of speed and that the driver had violated 28 A.R.S. sections 725 (limitations on overtaking on the left) and 726 (limitations on driving to left of roadway center) by coming within 100 feet of oncoming traffic, the lights of which were visible. (TR1:71-72; Exhibits 5 & 6 (copies of statutes)). Officer Dailey pulled into traffic and, after catching up to the Trooper, activated his overhead lights and siren and conducted a traffic enforcement stop at approximately Milepost 139.5. (TR1:23, 47 & 51).

Officer Dailey approached the driver side of the vehicle and asked the driver for his license and the vehicle registration. (TR1:23-24; TR2:44). At that point, the driver had the window rolled down and Officer Dailey could see that there were two occupants in the car: a male driver, who was later identified as Defendant Duke Preston, and a female passenger, who was later identified as Defendant Michelle Lopez. (TR1:24-25). While Preston was

---

[1] "TR1" refers to the Transcript of Motion Hearing dated September 19, 2006, and filed with the Clerk on September 21, 2006. *Docket No. 47*. "TR2" refers to the Transcript of the Continued Hearing dated November 1, 2006, and filed with the Clerk on November 9, 2006. *Docket No. 65*.

1 handing his identification to Officer Dailey, the officer detected the odor of raw marijuana
2 and observed a package of clear tape and cellophane wrapping in the back passenger seat.
3 (TR1:25 & 64; Exhibit 2 (photo)).  Officer Dailey then immediately detained the driver in
4 handcuffs and placed him in the caged portion of his patrol vehicle.  (TR1:27-28).  He also
5 handcuffed Lopez, but left her in the passenger front seat of the trooper and told her she was
6 being detained pending further investigation.  (TR1:28).

7 Officer Dailey then contacted his on-duty supervisor and the on-duty narcotics
8 detective and informed them of the situation.  (TR1:29).  He advised them that he had
9 detained two individuals and "had approximately ten to twelve bales [of marijuana] in the
10 vehicle . . . ."  (TR1:29 & 32).  At that time, although she had not been given her *Miranda*
11 warnings or been asked any questions, Lopez indicated to Officer Dailey that there were
12 actually sixteen bales in the vehicle.  (TR1 32).

13 Other officers then arrived at the scene and Lopez was placed in the back of another
14 patrol vehicle.  (TR1:32-33).  Narcotics Detective Cordova arrived and the Trooper was
15 searched and, in addition to the bales in the back seat, bales were found in the rear
16 compartment.  (TR1:33; Exhibit 3 (photo of bales in Trooper)).

17     **B.**    **Defendant Michelle Lopez**

18 On several significant points, Defendant Lopez's testimony varied from that of Officer
19 Dailey.  Lopez testified that, just prior to the stop, Defendant Preston, who was driving, had
20 slowed to less than the 65 miles per hour speed limit behind another vehicle, a dark blue van,
21 which was traveling at about 45 miles per hour.  (TR1:127-128).  Lopez says she discussed
22 with Preston whether they should pass the van and they decided to do so because of the slow
23 speed of the vehicle in front of them and because there was no other traffic around.
24 (TR1:129-130).  As they were beside the van, Lopez remembers a spot light shining on them
25 and she immediately knew it was the police.  (TR1:130).  Her recollection is that this
26 occurred at approximately Milepost 136.5, which is not in a "no passing" zone and is not
27 signed as such.  (TR1:130-132; Exhibit 104 (photograph of the area)).  Lopez was sure this
28

is where Officer Dailey was parked because she remembers that she and Preston were in front of a rest area when Preston initiated the pass. (TR1:132; TR2:34-35). She also testified that the roadway is straight, there was no oncoming traffic, and the area is otherwise appropriate for passing. (TR1:132-133). According to Lopez, Officer Dailey immediately pulled in behind the van they had passed and then proceeded to get in front of the van and behind the Trooper. (TR1:133). Lopez recalls that, after following for awhile, the officer activated his lights and initiated the stop. (TR1:134).

### C.   Investigator Gilbert Duron

On the first hearing day, Investigator Gilbert Duron testified that he had twice traveled to the area of the stop, once accompanied by Lopez, and had taken measurements, photographs, and prepared a video tape. (TR1:80). Relying on Lopez's version of events, and her recollection of where Officer Dailey's vehicle was stationed on the night in question, Duron parked his vehicle at approximately Milepost 136.5, approximately 500 feet west of the rest area, and placed the front bumper of his vehicle 44 feet from the solid white line on the side of the highway. (TR1:83; TR1:87; TR1:98; Exhibit 103 (photograph)). From this position, and from a driver's perspective from the vehicle, Duron indicated that he could see approximately 300 feet down the road to the east and approximately 200 to 250 feet to the west. (TR1:86-87; Exhibit 107 (photograph looking east); Exhibit 106 (photograph looking west)). Duron also took photographs from the eastbound and westbound roadway depicting how well drivers could see his vehicle when it was positioned 44 feet from the roadway. (TR1:89; Exhibit 112 (photograph looking west) & 113 (photograph looking east)).

Duron then reduced the distance from the white line to the front bumper to 22 feet. (TR1:87). Looking westbound from this new location, Duron could see approximately 500 feet. (TR1:87-88; Exhibit 108). From the same vantage point, Duron was able to see approximately 1580 feet to the east. (TR1:88; Exhibit 109). Duron indicated that when the vehicle was parked 22 feet from the roadway, it was no longer obscured by shrubs and

bushes and was clearly visible to eastbound and westbound traffic. (TR1:88-89; Exhibit 110 & 111).

Between the initial hearing and the continued hearing on the instant motion, Duron again went to the scene. On this visit, Duron found the location where Officer Dailey indicated that he was parked, and positioned the front bumper 21 feet from the edge of the road. (TR2:11-13). From that perspective, Duron determined that Officer Dailey was able to see approximately 200 feet looking west. (TR2:16-17; Exhibit 127 (looking westbound)).

## II. DISCUSSION

### A. Legality of the Stop

Lopez moves to suppress the evidence seized following the unlawful stop of the vehicle in which she was riding, alleging that Officer Dailey did not have reasonable suspicion to support the stop and that the marijuana discovered after the stop must be suppressed. Lopez argues that the stop was based on pretext as it was not executed in a "no passing" zone and that there was no oncoming traffic at the time.

The Fourth Amendment protects the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures. *U.S. v. Hensley*, 469 U.S. 221, 226 (1985). In *Terry v. Ohio*, 392 U.S. 1, 88 (1968), the Supreme Court held that, consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. The Court has held that law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226.

Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The articulable facts

forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir.1994).

It is well settled that evidence of a traffic violation is sufficient reasonable suspicion to stop a vehicle. *Wren v. United States*, 517 U.S. 806, 819 (1996); *United States v. Lopez-Soto,* 205 F.3d 1101, 1104-05 (9th Cir. 2000)). In *Wren*, a unanimous Supreme Court held that a stop was reasonable under the Fourth Amendment where officers had probable cause to believe that the defendant had violated the traffic code, even if the ultimate charge was not related to the traffic stop. 517 U.S. at 808-09. There, officers saw a truck in a "high drug area" stopped at a stop sign for an excessive amount of time before making a turn at an excessive speed without signaling. *Id.* at 808. When the officers stopped the vehicle, the officers observed a passenger holding tow large bags of what appeared to be crack cocaine. The passenger argued that the stop had not been justified by probable cause to believe that the occupants were engaged in illegal activity, and that the reason the officers offered for approaching the vehicle, which was to give the driver a warning, was pretextual. *Id.* at 809. On these facts, the Supreme Court held that the officers had probable cause to believe that various provisions of the traffic code had been violated. *Id.* at 810. Thus, under *Wren*, if officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose. *Devenpeck v. Alford*, 543 U.S. 146 (2004).

Here, Officer Dailey cites three reasons for conducting the stop. He asserts that there was a "no passing" sign at the point of the stop, that there was a solid yellow line, and that the pass was unsafe because the Trooper came within 100 feet of oncoming traffic.[2] Other than the fact that the car she was in did pass another vehicle, Lopez's version of events is

---

[2] Excessive speed was also alluded to, but Officer Dailey indicated that he stopped the vehicle because he believed it was passing in an unsafe manner, and not due to its speed. (TR1:71).

6

inconsistent with Officer Dailey's. Lopez testified that Officer Dailey was parked farther west than where he said he was and in an area of the road where there was no yellow line. She stated that there was no "no passing" sign, and no oncoming traffic. If the facts are as Officer Dailey recalls, there is reasonable suspicion, and if they are a Lopez recalls, there is not. Thus, the outcome of the motion is based entirely on a credibility determination.

As a threshold matter, in evaluating the credibility of Officer Dailey and Defendant Lopez, the Magistrate Judge has not found Investigator Duron's testimony helpful. His testimony, and the photographs he provided, certainly aided in the understanding of the area where the stop occurred and thereby assisted in evaluating the testimony of Officer Dailey and Lopez. However, the pertinent questions about road markings, signage and the presence of other traffic at the scene can be resolved only by evaluating the testimony of the witnesses who were present during the stop. As discussed below, when the credibility of the witnesses is considered, the totality of the circumstances indicate that Officer Dailey did not have reasonable suspicion to institute a stop.

In support of her contention that the location of the pass was not governed by a "no passing" sign and a solid yellow line, Lopez testified that she specifically recalled that they were "right in front of [a] rest stop," where there are no passing restrictions, when they first became aware that Officer Dailey was on the side of the road. (TR2:34; TR1:144). She specifically identified the vehicle that they were passing and the fact that there was no other traffic. (TR1:128 (describing the vehicle); TR1:129 (describing lack of traffic)). Bolstering the reliability of Lopez's testimony on this point is the fact that she had frequently traveled Route 86, as much as every other weekend, for many years. (TR1:143; TR2:35). Moreover, when questioned, Lopez recognized other areas of the road and was able to convincingly identify the location of landmarks in the area. (TR1:135 (identifying the area where Officer Dailey indicates he was parked); TR1:135 (identifying roadway and physical features of area where actual stop occurred). For example, she was certain Officer Dailey had not been parked where he claimed because that area was not across from the rest stop. (TR1:132).

1    Officer Dailey's testimony was less credible. At the time of the stop, Officer Dailey
2 had been working on the reservation for approximately one year. (TR1:36). Although at the
3 hearing the officer repeatedly asserted that the stop was initiated in a "no passing" zone
4 (TR1:17, 20 & 36), there is no reference to this significant factor in his notes or report.
5 (TR1:66-67). Coupled with Lopez's testimony, the absence of a reference to a "no passing"
6 zone leads the Court to conclude that this was not a factor considered by Officer Dailey at
7 the time of the stop. Officer Dailey's testimony was also inconsistent in relation to the other
8 traffic on the road. When asked on direct examination if he recalled "the color or type or
9 make of car that the Isuzu Trooper appeared to be passing," he equivocally responded, "I
10 believe it was a – I want to say tan or beige four-door sedan, smaller compact car."
11 (TR1:19). Officer Dailey was also not specific about other factors. Under general
12 questioning about the incident, he made no mention of a second car passed by the Trooper
13 (TR1:19-21), but stated for the first time on cross-examination that two vehicles were passed.
14 (TR1:49). He could not provide a description of the second vehicle, however. (TR1:51).

15    Cumulatively considered, Officer Dailey's failure to mention in his report that the
16 stop was made in a "no passing" zone, his uncertainty about the first vehicle that the Trooper
17 allegedly passed, and his initial omission of other seemingly significant factors (that the
18 Trooper passed two vehicles), gives the Court cause to question whether the Government has
19 met its initial burden of production by coming forward with specific and articulable facts to
20 support the stop.[3] *Terry v. Ohio*, 392 U.S. 1, 21 (1968). In any event, Lopez has met her
21 ultimate burden of proof in support of the motion to suppress. *United States v. Caymen*, 404
22 F.3d 1196, 1199 (9th Cir. 2005). As discussed above, she has presented evidence casting
23 doubt upon Officer Dailey's version of events, while also testifying credibly on her own

---

[3] Additionally, the fact that Officer Dailey failed to mention the "no passing" zone in his report suggests that it was not a factor considered in making the stop. As such, it cannot now be considered in evaluating reasonable suspicion. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (an investigatory stop may only be justified by considering factors that were present when the stop was made).

8

behalf. While the Magistrate Judge recognizes that she has significant incentives to present the events in a light favorable to herself, the credibility assessment favors Lopez and the totality of the circumstances indicate that the stop was not permissible under *Wren*.

### III.   RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule – Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **GRANT** the Motion to Suppress: Illegal Stop [Docket No. 27] and Amended Motion to Suppress: Illegal Stop [Docket No. 30] filed by Defendant Michelle Marlina Lopez, and **DENY AS MOOT** the joinder filed by Defendant Duke James Preston [Docket No. 31].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CR 06-397-TUC-FRZ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 28th day of November, 2006.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge